R. Scott Oswald (*To be admitted pro hac vice*)
David L. Scher (*To be admitted pro hac vice*)
**The Employment Law Group, P.C.**
888 17th Street, N.W., 9th Floor
Washington, D.C. 20006
(202) 261 – 2810
(202) 261 – 2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com
*Counsel for Plaintiff-Relator*

Andrew S. Friedman (AZ 005425)
Francis J. Balint, Jr. (AZ 007669)
Kevin Hanger (AZ 027346)
**Bonnett, Fairbourn, Friedman & Balint, PC**
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
(602) 274-1100
(602) 274-1199 (facsimile)
afriedman@bffb.com
fbalint@bffb.com
khanger@bffb.com
*Local Counsel for Plaintiff-Relator*





# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CHERYL SIFFORD<br><br>Plaintiff,<br><br>v.<br><br>SERENITY HOSPICE AND PALLIATIVE CARE; AND RUTH SIEGEL; and<br><br>Defendants. | **Case No.** CV-14-00225-PHX-GMS<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.*, AND THE ANTI-KICKBACK STATUTE, 42 U.S.C. §§ 1320a-7b, *et seq.*<br><br>**FILED UNDER SEAL<br>JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Qui tam relator Cheryl Sifford ("Relator" or "Sifford"), by her attorneys, individually and on behalf of the United States of America, files this Complaint against Defendants Serenity Hospice and Palliative Care ("Serenity"), and Ruth Siegel, (collectively, "Defendants") to recover damages, penalties, and attorney's fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA") and the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b et seq., ("AKS").

2.      Sifford began working for Serenity in 2012.

3.      Serenity provides hospice care to patients at multiple locations throughout Arizona.

4.      Serenity, through Siegel, pressures its Clinical Directors and Medical Directors to admit patients to hospice care even when the patient does not have a terminal prognosis.

5.      Serenity admits patients to hospice when the patient does not have a terminal prognosis.

6.      Serenity, through Siegel, pressures its Clinical Directors and Medical Directors to admit patients to hospice care even when the patient does not have the proper paperwork completed to be admitted to hospice care.

7.      Serenity admits patients to hospice when the patient does not have the proper paperwork completed to be admitted to hospice care.

8.      Serenity, through its officers, instructs Serenity staff to go back into patients' records and obtain the appropriate dates and signatures and then rescan the documents into their system.

9.      Serenity also submits claims to Medicare for reimbursement for hospice services provided to patients who: (1) are not eligible for hospice care; and (2) do not have the paperwork completed to be admitted to hospice care.

10.     Serenity receives reimbursement from Medicare for the claims that they submit on behalf of these patients who are not eligible for reimbursement.

11.     To Relator's knowledge, Defendants' fraud remains ongoing through the present.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

13.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants transact business in this judicial district.

14.     Venue is proper in this Court under 28 U.S.C. §1391(c) and 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district, Defendants are a resident of this district, and because Defendants transact business within this judicial district.

## PARTIES

15.     Relator Sifford was the former Vice President of Clinical Operations for Serenity and is a resident of Phoenix, Arizona.

16.     Defendant Serenity is an Arizona Corporation with multiple locations throughout the state, including Sun City West and Phoenix.  Serenity is in the business of providing hospice care to terminal patients.

17.     Defendant Ruth Siegel is President, part owner, and operator of Serenity and had supervisory authority over Sifford.

18.     Harvey Nevins is Secretary, part owner, and operator of Serenity and had supervisory authority over Sifford.

19.     Serenity hired Sifford as a Clinical Director in July 2012.

20.     Serenity promoted Sifford to Vice President of Clinical Operations in October 2012.

21.     Through her employment at Serenity and the positions she held, Sifford has firsthand knowledge of Defendants' fraudulent business practices.

22.     Sifford quit her employment with Serenity in August 2013 as a result of Serenity's continued illegal-admissions practices.

**FACTUAL ALLEGATIONS**

23.     Sifford earned a Bachelor of Science degree from Chamberlain College of Nursing and is currently working on completing her Master's Degree in Nursing Education from Chamberlain College of Nursing.

24.     Sifford has worked in hospice care since 1999.

25.     Serenity was founded by Siegel and Nevins in November 2004.

26.     Serenity became Medicare certified in June 2005.

27.     In May 2012 Siegel signed a Consent Agreement with the Arizona State

Board of Nursing wherein Siegel admitted that she had transcribed physician orders,

changed physician orders, and ordered medications after her LPN license expired, and

marketed Serenity as "Nurse Owned and Operated" even after her license had expired.

28.     The Arizona State Board of Nursing found that Siegel's "conduct

constitute[d] sufficient cause pursuant to A.R.S. §32-1663 (F) as defined in A.R.S. §32-

1601 (16) (d), (h), and (G) (effective August, 2004), and A.A.C. R4-19-403(21) and (23)

(effective November 13, 2005), to impose discipline on [Siegel]."

29.     Serenity hired Sifford as a Clinical Director in July 2012.

30.     As a Clinical Director, Sifford was responsible for clinical oversight of the

Central Phoenix Hospice Team, auditing documentation for Medicare compliance,

educating staff on documentation and best practice, and participating in quality

performance improvement projects among many other tasks.

31.     In October 2012 Sifford was promoted to the position of Vice President of

Clinical Operations.

32.     As VP of Clinical Operations, Sifford was responsible for clinical oversight

for Serenity, educating staff on compliance, regulations and documentation, hiring staff,

educating medical directors on compliance regarding documentation and face to face

visits, and various other management tasks.

33.    Serenity hired a new CEO in April 2013.

34.    Sifford resigned from Serenity in August 2013.

35.    In May 2013, Siegel was removed from her management position within Serenity.

### *Serenity Medical Directors certify that patients are eligible for hospice care when they have no knowledge about the patient*

36.    While Siegel was working in a day to day managerial capacity at Serenity, a particular CareMore physician would send Siegel all of his referrals for admission.

37.    This provider would also let Serenity know when certain patients are "CareMore VIP[s]."

38.    When Siegel was removed from her managerial position and was no longer able to process all of the CareMore provider's referrals, some of his referrals started to go through Sifford.

39.    This CareMore provider complained to the new Serenity executive managing the day to day business that Sifford was hard to deal with.

40.    The CareMore provider wanted to know who was going to take care of the CareMore referrals.

41.    On or about June 18, 2013, the CareMore Provider met with Sifford, two Serenity executives, RN Julie Gregory, and RN Billie Armstrong (the "June 18, 2013 meeting").

42.    At the meeting, the CareMore provider discussed his knowledge of hospice care, and his position within CareMore.

43.    At the meeting, Sifford asked the CareMore provider if he could help educate the Serenity nurses on why a particular patient meets hospice criteria, especially then their prognosis did not appear to meet hospice eligibility.

44.    In response, the CareMore provider said that he often does not know the individual patients that get referred from CareMore to Serenity because CareMore doctors are no the patients' primary care physicians.

45.    Sifford also asked the CareMore provider if he could assist in identifying why a particular patient is hospice eligible when they do not appear to be eligible because when Serenity nurses had previously asked this provider for assistance in determining a patient's eligibility, he responses "if you don't want that patient I will give the patient to Hospice of the Valley."

46.    After the June 18, 2013 meeting, one of the Serenity executives present at the meeting pulled Sifford aside and told her she was out of line for asking the CareMore provider to assist Serenity nurses in identifying why a patient is eligible for hospice.

47.    Sifford explained that she asked that question because when Serenity nurses had previously asked the CareMore provider for assistance in determining a patient's eligibility, the CareMore provider responded "if you don't want the patient I will give the patient to Hospice of the Valley" and she did not think that was appropriate.

48.    The Serenity executive appeared upset by Sifford's comments and informed her that they would continue the conversation later.

*Ruth Siegel pressures Serenity employees to admit all CareMore referrals regardless of their prognosis and treats CareMore employees to limo rides, dinners, and concerts to ensure that they keep referring patients to Serenity.*

49. Siegel, while still managing day to day operations at Serenity, would oversee all of the CareMore referrals.

50. After May 2013, despite being removed from her managerial position at Serenity, Siegel continued to ask about specific CareMore patients.

51. For example, on May 19, 2013, a Serenity executive asked Sifford about specific CareMore referrals as Siegel had asked a Serenity executive if the patients had been admitted.

52. Sifford responded that she would not give Siegel any information about patients because it would be a HIPAA violation to disclose patient information to Siegel when she no longer had a management role in Serenity.

53. Serenity "flags" patients that are referred by CareMore to ensure that they are admitted.

54. For example, Serenity placed an alert in patient George's paperwork to note that he is a CareMore referral.

55. Siegel also treats CareMore staff to dinners, concerts, and limo rides in order to keep Serenity in their good graces.

| | |
|---|---|
| **From:** | Christine Solenberger |
| **Sent:** | Friday, November 30, 2012 4:27 PM |
| **To:** | Ruth Siegel; Cheryl Sifford |
| **Subject:** | Limo Confirmation |
| | |
| **Importance:** | High |

Mirage Limo Service will arrive at Serenity Location for first pickup at 6:45pm!

Excursion White Limo will be waiting – then will go to Chelsea's Kitchen at 5040 N. 40th St to pick up rest of group!

Then off to Celebrity Theatre.

56. Siegel pressures Serenity nurses to admit patients to Serenity even when the patient is non terminal.

57. In October 2012, when Sifford first became VP of Clinical Operations, she questioned fellow VP, Bren Houk, about the pressure Siegel exerted to have patients admitted. Houk laughed and informed Sifford that Siegel "admitted everybody."

58. After Houk confirmed Sifford's suspicions, Sifford informed the nurses under her supervision that there was no pressure to admit patients they did not believe were eligible for hospice care.

59. Sifford's concerns were also confirmed by a former Serenity employee that she interviewed as a candidate for a vacant clinical director position at Serenity. When she learned the woman had worked for Serenity previously Sifford asked why the woman left. The woman informed Sifford that she left Serenity because

Siegel forced her to admit patients who were not appropriate for hospice care and she was concerned that Siegel's instructions put her nursing license at risk.[1]

### *Since Siegel's departure from a managerial role at Serenity, Serenity executives have continued to ensure that CareMore is taken care of*

60. In May 2013, shortly after Siegel was removed from her managerial position at Serenity, a new Serenity executive began managing the day to day affairs of Serenity.

61. In May 2013, the new Serenity executive and another high ranking Serenity executive met with Sifford.

62. At this meeting, the Serenity executives  told Sifford that a "yes person" was needed at Serenity to admit all of the CareMore referrals.

63. At this meeting, the Serenity executives  stressed to Sifford that CareMore is Serenity's number one referral source and Serenity needed the CareMore referrals.

64. The Serenity executives told Sifford that to keep the CareMore referrals coming to Serenity, Serenity "need[ed] to take care of [the CareMore provider]."

65. In response Sifford informed the Serenity executives that she was concerned about the legality of the relationship between CareMore and Serenity and that she was not comfortable with taking CareMore employees to dinners and concerts.

66. The Serenity executives decided at this meeting that they would assign another nurse to handle all of the CareMore referrals.

---

[1] The candidate only interviewed for the vacant clinical director position after Siegel was removed from her managerial position at Serenity.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Sifford v. Serenity Hospice and Palliative Care, et al.*

67. On or around June 7, 2013 the Serenity executive who handled the day to day management of Serenity asked a Clinical Director, RN Julie Gregory, to be the point person for those referrals.

68. This Serenity executive informed Gregory that she would be paid either a commission or a bonus for admitting CareMore patients.

69. This Serenity executive asked Gregory to come up with a monthly bonus amount she would accept to take care of the CareMore referrals.

70. This Serenity executive agreed to compensate Gregory an extra $1,000 per month until they could replace Sifford as VP of Clinical Operations and then the Serenity executive would compensate Gregory an additional $750 per month to handle all of the CareMore referrals once Sifford's vacant VP position was filled.

71. On or around June 7, 2013 the same Serenity executive met with Sifford and told Sifford that she would have to meet with the CareMore provider and the Serenity executive the following week.

72. The Serenity executive told Sifford that when the three of them met, Sifford and the Serenity executive had to be "on the same page."

73. Again, the Serenity executive stressed to Sifford that Serenity could not afford to lose the CareMore referrals and that Serenity needed the CareMore provider and if they did not make him happy then the CareMore provider would tell the other CareMore providers not to refer their patients to Serenity.

74. The Serenity executive instructed Sifford to focus on the future, not the past inappropriate patient admissions.

75. The Serenity executive also insinuated that it was Siegel who was responsible for the inappropriate admissions.

### Serenity admits patients to their hospice services that do not have a terminal diagnosis and are not properly certified to receive hospice services

76. To be eligible for hospice, Medicare patients must be entitled to Part A of Medicare and must be certified as being terminally ill based on the physician or Medical Director's clinical judgment that the patient's prognosis for life expectancy is six (6) months or less if the terminal illness runs its normal course.

77. The written certification for hospice election must include: 1) a statement that the individual's life expectancy is six months or fewer if the terminal illness runs its normal course; 2) specific clinical findings and other documentation supporting a life expectancy of six months or fewer; 3) a narrative explanation of the clinical findings that support as a life expectancy of six months or less; and 4) the physician's signature and date as well as the benefit period the certification applies to.

78. Serenity admits patients to hospice without providing the required written certification for hospice election.

79. A patient may only be admitted to hospice on the recommendation of the medical director in consultation with, or with input from, the patients attending physician, if the patient has an attending physician.

80. Serenity admits patients without the input of the patient's attending physician.

81. Serenity uses a computer software system called Consolo to record and track patient information.

82. Prior to a patient being admitted to Serenity, a Serenity nurse performs an evaluation of the patient and enters all of the patient's information into Consolo.

83. Based on the patient information entered by the nurse, the Consolo program will produce a report stating whether or not the patient is appropriate for hospice, and if they are appropriate, which billing codes the patient is eligible under.

84. As shown below, Serenity admits patients to their hospice program even when Consolo indicates that the patient is non-terminal:

85. Patient Herbert was admitted on February 15, 2012 even though Consolo indicated that Herbert was non-terminal.

86. Patient Herbert then stayed on hospice care at Serenity for over a year before he was ultimately discharged from Serenity's care on August 7, 2013.

87. Upon information and belief, patient Herbert was covered by Medicare and Serenity submitted claims to Medicare for reimbursement for service provided to Herbert despite his non-terminal prognosis.

88. More than half of Serenity's patients remain in hospice care for greater than six months.

89. Since December 2009, over 200 of Serenity's patients have been receiving or received hospice care for one year or longer.

90. Two of Serenity's patients, Mr. Laehn and Mr. Harvey, have been receiving hospice care for more than 30 months.

91. Serenity routinely certifies that patients are hospice eligible even when they are not.

92. Some of Serenity's Medical Directors certify that patients are hospice eligible without having ever seen the patient.

93. One Serenity Medical Director certifies that patients are eligible for hospice care without providing a narrative explanation of the clinical findings that support a life expectancy of six months or less as required by Medicare regulations.

94. Additionally, some Serenity Medical Directors will certify that patients are hospice eligible as if they are the patient's attending physician, even when the Medical Director is not the patient's attending physician.

95. One time, when Sifford asked Serenity RN, Sandra Parker why she was discharging a particular patient, Parker informed Sifford that the patient never should have been admitted to hospice because the patient was not eligible at the time of admission.

96. However, Parker informed Sifford that Siegel had called Parker twice to insist that Parker admit the patient despite Parker informing Siegel that the patient was non terminal and that Consolo confirmed Parker's assessment.

97. Despite Parker's statement to Siegel that the patient was non terminal and therefore not eligible for hospice, the patient's admission forms were signed by Dr. Napoleon Bravo, a Medical Director at Serenity.

98. When asked by Parker by he admitted the non terminal patient, Dr. Bravo replied that if he did not sign the certification admitting the patient Siegel would call him and insist the patient be admitted for a minimum of 90 days.

99. Dr. Bravo also signs certifications for patients as both their attending physician and as a Medical Director at Serenity even when he is not the patient's attending physician.

100. For example, Dr. Bravo signed patient Katherine's Certification certifying "that this patient is under my care, to the best of my medical knowledge given the data available, has a life expectancy of six (6) months or less if the disease runs its normal course."

101. Dr. Bravo signed off on patient Katherine's Certification even though an alternative attending physician is listed.

102. Once a patient has been admitted to Serenity for hospice care, Serenity will often admit the patient directly to General Inpatient ("GIP") care on the same day.

103.    GIP is predominantly for pain control or symptom management and is to be provided in an inpatient facility only when the patient's pain or symptoms cannot be managed elsewhere.

104.    GIP is reimbursed at a rate of $652.27 per day.

105.    Inpatient respite care, the standard level of hospice care provided by Serenity is compensated at a rate of $151.67 per day.

106.    Serenity admits patients to GIP without the necessary supporting documentation as to why GIP care is appropriate instead of inpatient respite care.

107.    For example, patient Blossom was admitted to GIP on the same day she was admitted to Serenity's care without any narrative about why GIP care was necessary.

108.    In 2011 Serenity admitted a total of 258 patients.

109.    Of the 258 patients admitted, 122 of the patients were admitted under a code of debility.

110.    Debility is a general diagnosis used for patients who are not acutely sick enough with a specific condition to be admitted under another diagnosis.

111.    Medicare is taking steps to eliminate the debility code in 2014.

112.    Medicare requires hospice patients entering into their third benefit period to have a face-to-face encounter with a physician or nurse so the care provider can certify that the patient is still eligible for hospice and has a prognosis of a life expectancy of six (6) months or less.

113.     The certification must also include a brief narrative explaining the clinical findings supporting the care provider's prognosis.

114.     When the provider signs the face-to-face certification, they are attesting that the narrative is based on the physician's examination of the patient or the medical record.

115.     Serenity physicians will sign face to face attestation forms without providing any narrative that supports their certification that the patient remains eligible for hospice care.

116.     For example, Dr. Bravo signed a certification attesting that patient Edna continued to be eligible for hospice care without providing any of the necessary information for why Edna continued to be eligible for hospice care.

***Serenity pressures its employees to admit patients prior to completing all of the appropriate paperwork in violation of Medicare regulations***

117.     Serenity, like all hospice providers, must obtain a patient's consent before the patient is eligible to be admitted to hospice care.

118.     Under 42 CFR § 418.24, a patient, or if the patient is physically or mentally incapacitated, his or her representative, must sign a formal election statement indicating that they consent to hospice care and forego curative treatment .

119.     Serenity is required to complete a Patient Authorization form and Election of Medicare form prior to admitting a patient to hospice care.

120.     Serenity does not obtain the proper dates or signatures on patient paperwork prior to admitting the patient.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Sifford v. Serenity Hospice and Palliative Care, et al.*

121.    For example, patient Maudie was admitted to Serenity hospice without obtaining the authorization for hospice care.

122.    As patients are admitted to Serenity, Serenity scans their admission documents into their computer system, Consolo, even if the documents are not completed.

123.    Serenity, through Siegel, then instructs its employees to go back into the patient folders and ensure that all documents have dates and signatures on the paper work.

124.    Serenity employees then rescan and replace the undated, unsigned documents in Serenity's computer system.

### Serenity submits claims for reimbursement to Medicare for patients that are not hospice eligible which damages the United States

125.    Serenity submits claims to Medicare for providing hospice services to patients covered by Medicare which Medicare reimburses.

126.    Upon information and belief, the vast majority of Serenity's patients are covered by Medicare.

127.    In 2011 Serenity was reimbursed a total of $15,378,379.33 by Medicare.

128.    In 2012 Serenity was reimbursed a total of $16,855,753.91 by Medicare.

129.    In 2013 Serenity was reimbursed a total of $15,719,172.92 by Medicare.

### COUNT I
### Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729(a)(1)(A) Knowingly Presenting Claims for Payment to the United States for Patients Who Did Not Qualify for

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Sifford v. Serenity Hospice and Palliative Care, et al.*

**Admission to Hospice Services As to Defendant Serenity
Hospice and Palliative Care**

130.     Relator reasserts and incorporates by reference all paragraphs set forth

above as if restated herein.

131.      Pursuant to 42 C.F.R § 418 generally, and specifically sections 418.20;

418.22; 418.24; 418.25; 418.54 and 418.200, Serenity must meet requirements for

certification of patients for hospice care to qualify for payment from the federal

government. Specifically, § 418.22 requires a medical certification of terminal

illness by a physician and that the certification be accompanied by documentation

to support a six-month prognosis.

132.     Relator has first-hand knowledge of numerous patients, and documentation

of at least forty six (46) patients that Serenity certified as eligible for hospice care,

who did not meet the criteria for hospice admission because they had not reached

the end-stage of their illness.

133.     Relator has first-hand knowledge of numerous patients, and documentation

at least twenty (20) patients, that Serenity admitted to hospice without proper

consent paperwork as required by 42 CFR § 418.24.

134.     For each of the representative patients described above, Serenity submitted

claims and received payment from the United States of America through Medicare

for hospice services provided to each patient despite the fact that each patient did

not meet the requirements for hospice admission.

135.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.  Serenity knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

136.     Upon information and belief, all of Serenity's locations follow the same practices of intentional non-compliance and false billing.

137.     Serenity's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance, which would substantially reduce corporate profits.

138.     Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

    a.  Who – Serenity Hospice and Palliative Care, through Siegel, its officers, and accounting department.

    b.  What – Presents claims to Medicare for reimbursement for patients who are not eligible for hospice care as they are non-terminal. Specifically, as illustrated above, Serenity admitted patient Herbert to hospice despite his non-terminal designation by Consolo.

c. Where – Serenity locations in Phoenix and Sun City West.

d. When – From 2005 through the present.

e. How – i) Admitting patients to hospice care that do not have a prognosis of a life expectancy of less than six (6) months; ii) admitting patients without the consent of their attending or primary care physician; iii) admitting patients without the proper narratives to support their admission to hospice care; iv) admitting patients directly to GIP without the proper supporting evidence for why GIP is appropriate; v) certifying that patients are eligible to remain in hospice care after a patients third benefit period; vi) instructing Serenity staff to admit patients without the proper paperwork completed and then having the staff retroactively fill out the paperwork and rescan it; vii) submitting claims to Medicare for reimbursement for patients who are receiving services from Serenity who are not eligible for such services as outlined above.

## COUNT II
### Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729(a)(1)(A) Knowingly Causing to be Presented Claims for Payment to the United States for Patients Who Did Not Qualify for Admission to Hospice Services As to Defendant Ruth Siegel

139.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

140.      Pursuant to 42 C.F.R § 418 generally, and specifically sections 418.20; 418.22; 418.24; 418.25; 418.54; and 418.200, Serenity must meet requirements for

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Sifford v. Serenity Hospice and Palliative Care, et al.*

certification of patients for hospice care to qualify for payment from the federal government. Specifically, § 418.22 requires a medical certification of terminal illness by a physician and that the certification be accompanied by documentation to support a six-month prognosis.

141.     Relator has first-hand knowledge of numerous situations where Siegel has ensured patients are admitted to hospice care even when they did not meet the criteria for hospice admission because they had not reached the end-stage of their illness.

142.     Relator has first-hand knowledge of numerous situations where Siegel has ensured patients are admitted to hospice without proper consent paperwork as required by 42 CFR § 418.24.

143.     For each of the representative patients described above, Serenity submitted claims and received payment from the United States of America through Medicare for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice admission.

144.     Siegel causes these fraudulent claims to be presented for payment by Medicare by ensuring these patients are admitted to Serenity even when they are not appropriate for hospice care.

145.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

146.    Siegel knowingly causes to be presented false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

147.    Siegel, part owner of Serenity, is aware of the non-compliant practices and has not taken action to accomplish compliance which would substantially reduce corporate profits.

148.    Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

   a.  Who – Ruth Siegel, co-owner and CEO of Serenity.

   b.  What – Causes to be presented false claims to Medicare for reimbursement for patients who are not eligible for hospice care as they are non-terminal. Specifically, as illustrated above, Siegel pressures Serenity staff to certify that patients are eligible for hospice when they are non-terminal. Similarly, as demonstrated above, Siegel pressures Serenity staff to admit patients that they know are not eligible for hospice because they are non-terminal.

   c.  Where – Serenity locations in Phoenix and Sun City West.

   d.  When – From 2005 through the present.

e. How – i) Repeatedly calling Serenity Medical Directors to pressure them to certify that patients have a prognosis of a life expectancy of less than six (6) months even when they do not; ii) repeatedly calling Serenity nurses to pressure them to admit patients that are not hospice eligible because they do not have a prognosis of a life expectancy of less than six (6) months; iii) instructing Serenity staff to admit patients without the proper paperwork completed and then having the staff retroactively fill out the paperwork and rescan it.

**COUNT III**
**Federal False Claims Act Claim pursuant to 31 U.S.C. §**
**3729(a)(1)(B) Knowingly Using False Claims for Payment**
**to the United States for Patients Who Did Not Qualify for**
**Admission to Hospice Services As to Defendant Serenity**
**Hospice and Palliative Care**

149. Relator reasserts and incorporates by reference all paragraphs set forth

above as if restated herein.

150. Pursuant to 42 C.F.R § 418 generally, and specifically sections 418.20;

418.22; 418.24; 418.25; 418.54; and 418.200, Serenity must meet requirements for

certification of patients for hospice care to qualify for payment from the federal

government. Specifically, § 418.22 requires a medical certification of terminal

illness by a physician and that the certification be accompanied by documentation

to support a six-month prognosis.

151. Relator has first-hand knowledge of numerous patients, and documentation

of at least forty six (46) patients that Serenity has certified are eligible for hospice

care who did not meet the criteria for hospice admission because they had not

reached the end-stage of their illness.

152. Relator has first-hand knowledge of numerous patients, and documentation

at least twenty (20) patients, that Serenity admitted to hospice without proper

consent paperwork as required by 42 CFR § 418.24.

153. For each of the representative patients described above, Serenity submitted

claims and received payment from the United States of America through Medicare

for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice admission.

154.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.  Serenity knowingly made false claims in the form of reimbursement claims to officials of the United States for the purpose of obtaining compensation.

155.    Upon information and belief all of Serenity's locations follow the same practices of intentional non-compliance and false billing.

156.    Serenity's corporate offices are aware of the non-compliant practices and have not taken action to accomplish compliance which would substantially reduce corporate profits.

157.    Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

      a.  Who – Serenity Hospice and Palliative Care, through Siegel, its officers, and accounting department.

      b.  What – Knowingly uses false claims to submit to Medicare for reimbursement for patients who are not eligible for hospice care as they are

non-terminal as demonstrated above by patient Herbert. Knowingly uses false claims to submit to Medicare for reimbursement for patients who are not eligible for GIP care as demonstrated above by patient Blossom.

c. Where – Serenity locations in Phoenix and Sun City West.

d. When – From 2005 through the present.

e. How – i) Admitting patients to hospice care that do not have a prognosis of a life expectancy of less than six (6) months; ii) admitting patients without the consent of their attending or primary care physician; iii) admitting patients without the proper narratives to support their admission to hospice care; iv) admitting patients directly to GIP without the proper supporting evidence for why GIP is appropriate; v) certifying that patients are eligible to remain in hospice care after a patients third benefit period; vi) instructing Serenity staff to admit patients without the proper paperwork completed and then having the staff retroactively fill out the paperwork and rescan it; vii) submitting claims to Medicare for reimbursement for patients who are receiving services from Serenity who are not eligible for such services as outlined above.

### COUNT IV
**Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729(a)(1)(B) Knowingly Causing to be Made and Used Claims for Payment to the United States for Patients Who Did Not Qualify for Admission to Hospice Services As to Defendant Ruth Siegel**

158.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

159.    Pursuant to 42 C.F.R § 418 generally, and specifically sections 418.20; 418.22; 418.24; 418.25; 418.54; and 418.200, Serenity must meet requirements for certification of patients for hospice care to qualify for payment from the federal government. Specifically, § 418.22 requires a medical certification of terminal illness by a physician and that the certification be accompanied by documentation to support a six-month prognosis.

160.    Relator has first-hand knowledge of numerous situations where Siegel has ensured patients are admitted to hospice care even when they did not meet the criteria for hospice admission because they had not reached the end-stage of their illness.

161.    Relator has first-hand knowledge of numerous situations where Siegel has ensured patients are admitted to hospice without proper consent paperwork as required by 42 CFR § 418.24.

162.    For each of the representative patients described above, Serenity submitted claims and received payment from the United States of America through Medicare for hospice services provided to each patient despite the fact that each patient did not meet the requirements for hospice admission.

163.     Siegel causes these fraudulent claims to be presented for payment by Medicare by ensuring these patients are admitted to Serenity even when they are not appropriate for hospice care.

164.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

165.     Siegel knowingly causes to be presented false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

166.     Siegel, part owner of Serenity, is aware of the non-compliant practices and has not taken action to accomplish compliance, which would substantially reduce corporate profits.

167.     Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

    a.  Who – Ruth Siegel, co-owner and CEO of Serenity.

    b.  What – Knowingly causes to be presented false claims to Medicare for reimbursement for patients who are not eligible for hospice care as they are non-terminal. Specifically, as illustrated above, Siegel pressures Serenity

staff to certify that patients are eligible for hospice when they are non-terminal.  Similarly, as demonstrated above, Siegel pressures Serenity staff to admit patients that they know are not eligible for hospice because they are non-terminal.

c. Where – Serenity locations in Phoenix and Sun City West.

d. When – From 2005 through the present.

e. How – i) Repeatedly calling Serenity Medical Directors to pressure them to certify that patients have a prognosis of a life expectancy of less than six (6) months even when they do not; ii) repeatedly calling Serenity nurses to pressure them to admit patients that are not hospice eligible because they do not have a prognosis of a life expectancy of less than six (6) months; iii) instructing Serenity staff to admit patients without the proper paperwork completed and then having the staff retroactively fill out the paperwork and rescan it.

## COUNT V
### Federal False Claims Act Pursuant to
### 42 U.S.C. § 1320a-7b(g)(b)(2) Anti-Kickback Statute
### for Knowingly and Willfully Receiving Remuneration in
### Return for Referring Medicare Patients to Serenity As to
### Defendant Serenity Hospice and Palliative Care

168.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Sifford v. Serenity Hospice and Palliative Care, et al.*

169.     Serenity knowingly caused to be presented to the United States

Government false or fraudulent claims for payment or approval under the federally

funded Medicaid and Medicare programs in violation of 31 U.S. C. § 3729(a)(l)

when Serenity violated 42 U.S.C. § 1320a-7b with its structured kickback system

to induce Clinical Director Julie Gregory to admit all CareMore referrals

regardless of whether or not the patient was terminal because 42 U.S.C. § 1320a-

7b(g) provides that a claim that includes items or services resulting from a

violation of this section constitutes a false or fraudulent claim for purposes of the

federal False Claims Act.

170.     Serenity knowingly offered kickbacks to Gregory when its CEO and co-

owner offered Gregory additional money to admit all CareMore referrals even

when they were not hospice appropriate, even though Serenity management knew

this practice was a violation of the law as evidenced by the fact that a Serenity

executive and Nevins did not want to allow Sifford to handle CareMore referrals

because she did things "by the book."

171.     For each of the representative patients described above, Serenity submitted

claims and received payment from the United States of America through Medicare

for hospice services provided to each patient referred by CareMore and admitted

to Serenity regardless of whether or not the patient was eligible for hospice

services.

172.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

173.    Serenity is aware of the non-compliant practices and has not taken action to accomplish compliance, which would substantially reduce corporate profits.

174.    Even though a relator is not required to identify every conceivable detail of a fraud to satisfy Rule 9(b) and then, even if specific false claims were not alleged, Relator need only allege sufficient indicia of reliability, Relator in this case has in fact alleged the who, what, where, when and how of the fraud alleged in this Count:

    a.  Who – Serenity Hospice and Palliative Care, through its officers, and executives. .

    b.  What – Providing incentive to Clinical Director Julie Gregory in the form of cash payments for admitting all CareMore referrals.

    c.  Where – Serenity locations in Phoenix and Sun City West.

    d.  When – From June 2013 through the present.

    e.  How – Offering cash incentive to Clinical Director Gregory for being the "yes person" and admitting all CareMore referrals.

## COUNT VI
## Conspiracy to Submit False Claims 31 U.S.C. § 3729(a)(1)(C)
## As to All Defendants

175.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

176.    Through the acts and omissions described in this Complaint and from on or before at least 2007 through present, Defendants and persons known and unknown, knowingly agreed and conspired to defraud the federal government by having false or fraudulent statements, records, certifications, and claims submitted to and approved by Medicare.

177.    The operations of the Defendants are so intertwined that they are effectively one single enterprise.

178.    Defendants conspired to admit patients to hospice that did not have a prognosis of a life expectancy of six (6) months or less and to refer patients from CareMore's services to Serenity's services regardless of their need for hospice services.   Serenity then submits claims for hospice services rendered to the patients who were falsely certified as hospice eligible.

## **PRAYER FOR RELIEF**

WHEREFORE, the Relator Cheryl Sifford, acting on behalf of and in the name of the United States of America, and on her own behalf, prays that judgment be entered against Defendants for violation of the False Claims Actand the Anti-Kickback Statute as follows:

(a) In favor of the United States against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Acts;

(b) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(c) For all costs of the False Claims Act civil action; and

(d) In favor of the Relator and the United States for further relief as this court deems just and equitable.

(e) In favor of the United States against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the Anti-Kickback Statute;

(f) In favor of the United States against the Defendants for treble damages to the federal government from the submission of false claims, and the maximum civil penalties for each violation of the Anti-Kickback Statute; and

(g) In favor of the Relator and the United States for further relief as this court deems just and equitable.

DATED this 28th Day of September, 2015.

Respectfully submitted,

*Daniel Scher by KKH*

R. Scott Oswald, *to be admitted pro hac vice*
David L. Scher *to be admitted pro hac vice*
The Employment Law Group, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C. 20006
(202) 261 – 2810
(202) 261 – 2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com
*Counsel for Plaintiff-Relator*

Andrew S. Friedman (AZ 005425)
Francis J. Balint, Jr. (AZ 007669)
Kevin Hanger (AZ 027346)
Bonnett, Fairbourn, Friedman & Balint, PC
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
(602) 274-1100
(602) 274-1199 (facsimile)
afriedman@bffb.com
fbalint@bffb.com
khanger@bffb.com
*Local Counsel for Plaintiff-Relator*